**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**ELKIN JOHAN VERGEL GONZALEZ,**
**AMINULLAH AMIN, MOHAMMAD AQIL**
**QASEMI, NASIM WAKIL, RONAL DANIEL**
**CELIS-DONADO,**

|  |  |
|---|---|
| | **9:26-CV-1435** |
| | **(MAD)** |

**Petitioners,**

**MOHAMMAD NAWID EBRAHIMI, and**
**MISAEL MARTINEZ RAMIREZ,**

**Petitioners,**

    **vs.**                                        **9:26-CV-1436**
                                                     **(MAD)**

**PHILIP RHONEY, DAVID VENTURELLA,**
**MARKWAYNE MULLIN, and TODD BLANCHE,**

**Respondents.**

---

**APPEARANCES:**                          **OF COUNSEL:**

**BOROWSKI WITMER**                  **MATTHEW BOROWSKI, ESQ.**
**IMMIGRATION LAWYERS**
4343 Union Road
Buffalo, New York 14225
Attorney for Petitioners

**OFFICE OF THE UNITED**              **ALEXIS M. OSBORNE, AUSA**
**STATES ATTORNEY**
445 Broadway, Room 218
Albany, New York 12207
Attorney for Respondents

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

1

## I. INTRODUCTION

On Sunday, July 26, 2026, the Northern District of New York received six petitions for habeas corpus filed on behalf of eleven individuals who were seeking relief from detention by the Department of Homeland Security's ("DHS") Immigration and Customs Enforcement Office ("ICE").[1]  The undersigned has been assigned two of these case brought by Petitioners Elkin Johan Vergel Gonzalez ("Gonzalez"), Aminullah Amin ("Amin), Mohammad Aqil Qasemi ("Qasemi"), Nasim Wakil ("Wakil"), Ronal Daniel Celis Donado ("Celis-Donado")[2], Case No. 9:26-CV-1435; and Petitioners Mohammad Nawid Ebrahimi ("Ebrahimi") and Misael Martinez Ramirez ("Ramirez"), Case No. 9:26-CV-1436.  In both cases, Petitioners name the following Respondents: Philip Rhoney as Acting Field Office Director of the ICE Buffalo Field Office; David Venturella as ICE's Acting Director; Markwayne Mullin, DHS Secretary; and Todd Blanche, Attorney General of the U.S. Department of Justice.  The issues raised by all seven Petitioners are of such a similar nature that the Court will resolve them in a single decision.

Petitioners have been detained by ICE since July 26, 2026, and request immediate release. Respondents oppose the Petition.  *See* Dkt. No. 7.  Petitioners filed replies.  *See* Dkt. No. 8.  For the following reasons, the Petitions are granted and Petitioners shall be immediately released.

---

[1] *Macario Gonzalez v. Rhoney*, No. 9:26-CV-1437 (N.D.N.Y.); *Escobar Clavijo v. Venturella*, 9:26-CV-1438 (N.D.N.Y.), Dkt. No. 7 (Respondents informing the Court of the petitioner's release after the habeas petition had been filed but before the Court issued a decision); *Qureshi v. Rhoney*, No. 9:26-CV-1439 (N.D.N.Y), Dkt. No. 8 (granting habeas petition and ordering petitioner's immediate release); *Rodriguez v. Venturella*, 9:26-CV-1440 (N.D.N.Y.), Dkt. No. 7 (same).

[2] In the petition, Celis Donado is not hyphenated.  *See* Dkt. No. 1.  In Respondents' memorandum of law, the Petitioner is mostly referred to as "Donado," but Respondents sometimes hyphenate his last name.  Dkt. No. 7 at 5.  In the administrative documents related to this Petitioner, his last name is hyphenated, Celis-Donado, *see* Dkt. No. 7-2, but, Petitioner signed his name, "Ronal Celis."  Dkt. No. 7-5 at 1.  The Court will utilize the hyphenated version throughout this decision.

## II.  BACKGROUND

**A.    Alternatives to Detention Program**

Before explaining each of the Petitioners' circumstances, the Court finds it prudent to explain an ICE program that is relevant to them all: Alternatives to Detention ("ATD"). According to ICE's website, ATD "programs exist to ensure compliance with release conditions and provide important case management services for non-detained aliens." *Alternatives to Detention*, ICE Portal, https://portal.ice.gov/immigration-guide/atd, (last visited Aug. 11, 2026). The website explains as follows:

> ATD consists of multiple distinct subprograms such as:
>
> - Intensive Supervision Appearance Program (ISAP).  This could include Extended Case Management Services (ECMS)
>
> - Young Adult Case Management Program (YACMP)
>
> - Case Management Pilot Program (CMPP) in partnership with DHS's Office for Civil Rights and Civil Liberties
>
> Each program relies on different methods and levels of supervision. ISAP determines how much supervision is necessary on a person-by-person basis.  ECMS works to ensure that people in its program receive proper care and resources during their immigration processes.
>
> ICE developed these programs to ensure compliance with release conditions and case management services for non-detained aliens. The ATD programs also increase court appearance rates, ensuring that aliens make their way through their immigration processes.

*Id.*

A now-archived page on ICE's website explains that "[t]he daily cost per ATD-ISAP participant is less than $4.20 per day — a stark contrast from the cost of detention, which is around $152 per day." *Alternatives to Detention*, ICE, https://www.ice.gov/features/atd, (last

visited Aug. 11, 2026).  It notes that "[e]ach alien enrolled in ATD-ISAP receives an individualized determination as to their level of supervision."  *Id.*  Enforcement and Removal Operations ("ERO") "may transition an alien's supervision level by considering certain factors."  *Id.*  "Factors considered in both initial placement and changes to supervision level, as relevant, include criminal history, compliance history, community or family ties, caregiver concerns, and other humanitarian or medical concerns."  *Id.*; *see also Imposition of bond*, IMMIGR. LAW & CRIMES § 8:16 ("ISAP is a program that will only be available to noncitizens who are not subject to mandatory detention, who are pending immigration court proceedings or awaiting removal from the United States, who are residing within the managed area, and who are not deemed a threat by the Department of Homeland Security").

**B.    Petitioners in Case No. 9:26-CV-1435**

**1. Elkin Johan Vergel Gonzalez**

Gonzalez is a native and citizen of Colombia.  *See* Dkt. No. 7-22 at 1.[3]  He entered the United States unlawfully on May 5, 2022, and was apprehended by Customs and Border Patrol ("CBP").  *See id.* at 2.  DHS released Gonzalez on humanitarian parole pursuant to 8 U.S.C. § 1182(d)(5)(A) on May 23, 2022.  *See* Dkt. No. 7-23.  The letter explaining Gonzalez's parole, which he signed, states that his "parole authorization is valid for one year beginning from the date on this notice and will automatically terminate upon [his] departure from or removal from the United States or at the end of the one-year period unless ICE provides [him] with an extension as its discretion."  *Id.*  The letter also explains that parole "is not valid for work authorization and is

---

[3] Citations are to the pagination generated by the Court's electronic filing system, CM/ECF, in the header of each page.

4

not an admission in lawful status." *Id.*   Additionally, DHS informed Gonzalez that "[p]arole is entirely within the discretion of ICE and can be terminated at any time and for any reason." *Id.*

Gonzalez's parole was subject to ATD supervision.  *See* Dkt. No. 7-24.  DHS then issued Gonzalez a Notice to Appear ("NTA") on April 1, 2026, which required him to appear before an immigration judge in Buffalo, New York, on December 31, 2026.  *See* Dkt. No. 7-25 at 1.

On July 26, 2026, ICE was effectuating "Operation ERO ESB"[4] "[i]n response to the President's declaration of a national emergency related to illegal immigration[.]"  Dkt. No. 7-26 at 2.  Gonzalez reported to the Albany ERO suboffice, which was "demand[ed]" by the ATD program and he was arrested.  *Id.*  The DHS arrest record indicates that Gonzalez had applied and was authorized for Employment Authorization through form I-765 on November 16, 2023.  *See id.*  He has an initial immigration hearing scheduled for June 25, 2026.  *See id.*  Gonzalez has no criminal history.  *See id.*

An arrest warrant was dated and served on Gonzalez the following day, July 27, 2026.  *See* Dkt. No. 7-27.  Respondents have not presented a formal parole termination letter related to Gonzalez which, as discussed below, has been provided for other Petitioners.

### 2. Aminullah Amin

Amin is a native and citizen of Afghanistan.  *See* Dkt. No. 7-28 at 1.  He entered the United States unlawfully on August 2, 2022, and was apprehended by CBP.  *See id.* at 5-6.  DHS released Amin on parole "under INA 212(d)(5) due to detention capacity issues at San Diego Sector."  *Id.* at 6.  He was released on September 9, 2022.  *See id.*  Amin was subject to ATD

---

[4] Throughout the administrative records provided by Respondents, Petitioners' arrests are noted to be part of an operation called "ESB."  None of the documents in either of these cases identify what that means.  However, in one of the Court's other cases, the DHS record indicates that ICE officers were "conduct[ing] operation Empire Strikes Back" on July 26, 2026, "at the ALB ICE ERO suboffice." *Qureshi v. Rhoney*, 9:26-CV-1439, Dkt. No. 7-1 at page 2.

supervision at the time of his release. *See* Dkt. No. 7-29. DHS issued Amin an NTA on November 15, 2022, which required him to appear before an immigration judge on June 8, 2023, in Buffalo, New York. *See* Dkt. No. 7-31 at 1. Amin was then released on his own recognizance, not on parole. *See* Dkt. No. 7-32.

On July 26, 2026, "during Operation ERO ESB[,]" Amin reported to the Albany ERO suboffice "pursuant to an ATD demand and was taken into custody." Dkt. No. 7-33 at 2. The DHS record notes that on October 26, 2023, Amin applied and was approved for Employment Authorization by DHS. *See id.* He also filed an Application for Temporary Protected Status on April 14, 2025, and a Petition for Alien Relative on September 8, 2025, which are pending. *See id.* Amin has no criminal history. *See id.* at 3.

A Warrant for Arrest of Alien dated August 8, 2026, was served on Amin while he was detained in Malta, New York. See Dkt. No. 7-34. That was two days before Respondents' filing was due to this Court and two weeks after Amin's arrest.

### 3. Mohammad Aqil Qasemi

Qasemi is a native and citizen of Afghanistan. *See* Dkt. No. 7-15 at 1. He applied for admission to the United States on June 23, 2024, by making an appointment with immigration officials through the CBP One application. *See id.* at 3. Qasemi had attempted to do so "multiple times" in the past "but was never approved for an appointment date and time." *Id.* On August 13, 2024, DHS determined that Qasemi asserted a credible fear of persecution. *See* Dkt. No. 7-16 at 6. On August 14, 2024, DHS served Qasemi with an NTA which required him to appear before an immigration judge on September 4, 2024, in San Diego, California. *See* Dkt. No. 7-17 at 1. He was released on parole under § 1182(d)(5)(A) on August 27, 2024. *See* Dkt. No. 7-18. Respondents state that Qasemi was "subject to ATD supervision" and cite to his Record of

Determination/Parole Determination Worksheet. Dkt. No. 7 at 7 (citing Dkt. No. 7-18). Respondents do not provide an ATD Enrollment Notice signed by Qasemi, which they do provide for the other Petitioners.

On July 26, 2026, Qasemi reported to the Albany ERO suboffice "pursuant to an ATD demand and was taken into custody without incident." Dkt. No. 7-19 at 2. DHS's record indicates that Qasemi "is scheduled for a master hearing" before an immigration judge on October 15, 2026, in Buffalo, New York. *Id.* Back on May 20, 2025, Qasemi applied and was approved for Employment Authorization. *See id.* He has no known criminal history. *See id.* He has one son who is a United States citizen. *See id.* at 1.

The warrant for Qasemi's arrest is dated and signed the day after he was apprehended. *See* Dkt. No. 7-20. His parole was likewise terminated a week later, on August 4, 2026, by Michael Ball, Acting Deputy Field Office Director. *See* Dkt. No. 7-21. The letter terminating his parole states that his "parole is hereby terminated, effective the date of this letter." *Id.*

### 4. Nasim Wakil

Wakil is a native and citizen of Afghanistan. *See* Dkt. No. 7-8 at 1. He applied for admission to the United States on October 11, 2024. *See id.* at 2. He did not have an appointment with immigration officials and arrived at the United States/Mexico border with his minor brother. *See id.* DHS determined that Wakil had a credible fear of persecution if he was to return to Afghanistan. *See* Dkt. No. 7-9 at 7. DHS issued Wakil an NTA, which required him to appear before an immigration judge in San Diego, California, on January 2, 2024. *See* Dkt. No. 7-9 at 1. DHS released Wakil on parole pursuant to § 1182(d)(5)(A) on December 20, 2024. *See* Dkt. No. 7-10. He was subject to ATD supervision. *See* Dkt. No. 7-11.

"On July 26[], 2026, ICE [ATD] Officers were conducting mandatory ATD check-ins at the ALB ICE ERO suboffice.  WAKIL reported to the ALB suboffice pursuant to ATD demand and was subsequently taken into custody."  Dkt. No. 7-12 at 2.  Wakil has a pending application for asylum, which was filed on January 22, 2025.  *See id.*  He also applied and was approved for Employment Authorization on July 10, 2025.  *See id.*  DHS noted in its Record of Deportable/Inadmissible Alien that "WAKIL has no known criminal history."  *Id.*

The warrant for Wakil's arrest is dated and signed July 27, 2026—the day after he was apprehended.  *See* Dkt. No. 7-13.  His parole was then terminated by a letter from Michael Ball, Acting Deputy Field Office Director, on August 4, 2026.  *See* Dkt. No. 7-14.

**5. Ronal Daniel Celis-Donado**

Celis-Donado is a native and citizen of Colombia.  *See* Dkt. No. 7-2 at 1; *see also* Dkt. No. 7-6 at 1.  He unlawfully entered the United Sates on October 4, 2024, and was apprehended by CBP.  *See* Dkt. No. 7-2 at 2.  DHS processed Celis-Donado for expedited removal.  *See id.* at 4.  According to Respondents, DHS determined that Celis-Donado had a credible fear of persecution if he returned to Colombia.  *See* Dkt. No. 7 at 6.  DHS issued an NTA, which required him to appear before an immigration judge in Pearsall, Texas on November 14, 2024.  *See* Dkt. No. 7-4 at 2.  DHS released Celis-Donado on his own recognizance, but subject to ATD supervision, on November 9, 2024.  *See* Dkt. No. 7-5.  Respondents admit that Celis-Donado "has remained at liberty under the [Order of Release on Recognizance] and ATD supervision since."  Dkt. No. 7 at 6.

On July 26, 2026, Celis-Donado went to the Albany ERO suboffice as "demand[ed]" as part of his ATD program.  Dkt. No. 7-6 at 2.  He was then arrested.  *See id.*

Celis-Donado has no criminal arrests or convictions. *See id.* He has one daughter who is a United States citizen. *See id.* at 1-2. Like the other Petitioners, the warrant for his arrest is dated and signed the day after he was apprehended. *See* Dkt. No. 7-7.

**C.    Petitioners in Case No. 9:26-CV-1436**

**1. Mohammad Nawid Ebrahimi**

Ebrahimi is a native and citizen of Afghanistan. *See* Dkt. No. 7-1 at 1. He applied for admission to the United States on February 14, 2024. *See id.* at 2. Ebrahimi asserted a fear of persecution. *See id.* at 3. DHS released Ebrahimi on parole pursuant to § 1182(d)(5)(A) on February 22, 2024. *See* Dkt. No. 7-3 at 1. He was required to participate in the ATD program. *See id.* On April 19, 2024, Ebrahimi was served with an NTA, which charged Ebrahimi with being a noncitizen who had entered the United States without inspection. *See* Dkt. No. 7-5. Respondents acknowledge this was "erroneous[]" and on June 4, 2026, DHS issued a new NTA. Dkt. No. 7 at 2; *see also* Dkt. No. 7-6. The revised NTA required Ebrahimi to appear in immigration court in Buffalo, New York, on August 31, 2027. *See* Dkt. No. 7-6 at 1. Respondents contend that "[p]ursuant to 8 C.F.R. § 212.5(e)(2)(i), service of a charging document upon a paroled noncitizen constitutes written notice of termination of parole unless otherwise specified, and upon termination the noncitizen is restored to the immigration status held at the time parole was granted." Dkt. No. 7 at 2.

On July 26, 2026, "as part of reporting requirements[,]" Ebrahimi went to the Albany ERO suboffice. Dkt. No. 7-7 at 2. DHS's Record of Deportable/Inadmissible Alien indicates that law enforcement officers were acting "[i]n response to the President's declaration of a national emergency related to illegal immigration . . . ." *Id.* The DHS record also indicates that on June 11, 2024, Ebrahimi applied for Employment Authorization through a form I-765. *See id.* at 3.

The record states, "Denied for Subject; DHS issued a card on June 11, 2024[,] for subject." *Id.* Then, "[o]n March 20, 2025, DHS filed I-765 – Application for Employment Authorization and Approved for Subject; DHS issued a card on March 20, 2025[,] for Subject." *Id.* Ebrahimi told immigration officials that he was employed as a security guard at Strategic Security Corp. *See id.* at 4. The record also reflects that Ebrahimi has no criminal history. *See id.* at 3.

The warrant for Ebrahimi's arrest is dated and was served the day after his arrest, on July 27, 2026. *See* Dkt. No. 7-8.

### 2. Misael Martinez Ramirez

Ramirez is a native and citizen of Mexico. *See* Dkt. No. 7-9 at 1-2. Ramirez first entered the United States unlawfully in 2013, and again in 2014. *See* Dkt. Nos. 7-9, 7-10. Ramirez was subject to a removal order in 2013 which was reinstated in 2014. *See* Dkt. Nos. 7-11, 7-12. Respondents expressly disavow reliance on these encounters to justify Ramirez's current detention. *See* Dkt. No. 7 at 3.

On September 25, 2024, Ramirez applied for admission to the United States. *See* Dkt. No. 7-13 at 2. During his interview, Ramirez admitted that he had illegally entered the United States, previously, and had been apprehended. *See id.* at 3. DHS served him with an NTA and placed him in removal proceedings on October 9, 2024. *See* Dkt. No. 7-14. On October 25, 2024, DHS released Ramirez on parole under § 1182(d)(5)(A). *See* Dkt. No. 7-15. Ramirez was subject to the ATD program, which included being subject to GPS monitoring. *See id.* at 4.

On July 26, 2026, after being "demand[ed]" to appear as part of the ATD program, he was arrested by ICE ERO officers. Dkt. No. 7-17 at 2. According to DHS's Record of Deportable/Inadmissible Alien for Ramirez, he has no criminal arrests or convictions. *See id.* The record also indicates that on December 10, 2025, Ramirez applied and was approved for

Employment Authorization.  *See id.*  He has an immigration hearing scheduled for June 7, 2028, in Buffalo, New York.  *See id.*

The warrant for his arrest is dated July 27, 2026, the day after the arrest.  *See* Dkt. No. 7-18.  Respondents also provided the Court with a letter dated August 4, 2026, which states, "Subject: Termination of Parole Pursuant to 8 C.F.R. § 212.5(e)."  Dkt. No. 7-19.  The letter notes that Ramirez was released on parole on October 25, 2024.  *See id.*  It then states that "[n]either urgent humanitarian reasons nor significant public benefit warrant your continued parole at this time.  In accordance with Title 8 Code of Federal Regulations, section 212.5(e)(2)(i), your parole is hereby terminated, effective the date of this letter."  *Id.*  The letter is signed bby Michael Ball, Acting Deputy Field Office Director.  *See id.*

As to all Petitioners, Respondents do not once acknowledge Petitioners' work authorization, lack of criminal history, and/or United States citizen children, or the fact that the warrants were dated and served after their arrests and their parole was terminated one week later.

### III. DISCUSSION

**A.      Legal Standard**

A district court may "grant a writ of habeas corpus whenever a petitioner is 'in custody in violation of the Constitution or laws or treaties of the United States.'"  *Veletanga v. Noem*, No. 25-CV-9211, 2025 WL 3751865, *2 (S.D.N.Y. Dec. 26, 2025) (quoting *Wang v. Ashcroft*, 320 F.3d 130, 140 (2d Cir. 2003), *superseded by statute on other grounds*, 8 U.S.C. § 1252(a)(4)); *see* 28 U.S.C. § 2241(c)(3).  "This jurisdiction includes habeas petitions filed by immigration detainees[,]" *Padilla Molina v. DeLeon*, No. 25-CV-6526, 2025 WL 3718728, *2 (E.D.N.Y. Dec. 23, 2025) (citing *Velasco Lopez v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020)), including non-citizens, *see R.P.L. v. Maldonado*, 814 F. Supp. 3d 301, 304 (E.D.N.Y. 2025).

11

"'[T]he petitioner "bears the burden of proving that he is being held contrary to law[,] and because the habeas proceeding is civil in nature, the petitioner must satisfy his burden of proof by a preponderance of the evidence."'" *Veletanga*, 2025 WL 3751865, at *2 (quoting *Dzhabrailov v. Decker*, No. 20-CV-3118, 2020 WL 2731966, *3 (S.D.N.Y. May 26, 2020)); *see Skaftouros v. United States*, 667 F.3d 144, 158 (2d Cir. 2011).

**B.    Statutory Authority for Petitioner's Detention**

The parties dispute the statutory authority for Petitioner's detention.  Petitioner argues that 8 U.S.C. § 1226 applies.  *See* Dkt. No. 1.  That provision states, in relevant part, that "[o]n a warrant issued by the Attorney General, an alien *may* be arrested and detained pending a decision on whether the alien is to be removed from the United States.  8 U.S.C. § 1226(a) (emphasis added).  "[D]etention under § 1226(a) is discretionary." *Gaspar v. Akshar*, No. 9:26-CV-118, 2026 WL 699369, *4 (N.D.N.Y. Feb. 17, 2026) (citing *Tumba v. Francis*, 813 F. Supp. 3d 394, 399 (S.D.N.Y. 2025)); *see Barbosa da Cunha v. Freden*, 175 F.4th 61, 72 (2d Cir. 2026).  Section 1226 "allows a noncitizen to 'request a bond hearing before an immigration judge.'" *Hassan v. Bondi*, No. 9:26-CV-319, 2026 WL 891602, *2 (N.D.N.Y. Apr. 1, 2026) (quoting *O.F.B. v. Maldonado*, 810 F. Supp. 3d 394, 400 (E.D.N.Y. 2025)).

Respondents argue that 8 U.S.C. § 1225(b) applies.  *See* Dkt. No. 7.  That provision states, in relevant part as follows: "[I]n the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title." 8 U.S.C. § 1225(b)(2)(A).  Under § 1225(b), detention is mandatory. *See Hassan*, 2026 WL 891602, at *2 (quoting *Jennings v. Rodriguez*, 583 U.S. 281, 297 (2018)).

12

The Second Circuit recently determined that § 1226 "plainly applies to noncitizens . . . who are present in the United States, but charged as inadmissible for entering the country without inspection and admission." *Barbosa da Cunha*, 175 F.4th at 73.  On the other hand, § 1225(b)(2)(A) "applies only to a noncitizen who is both an 'applicant for admission' and who is 'seeking admission.'" *Id.* at 74.  The Second Circuit construed "applicant for admission" to mean a "noncitizen[] who [is] present [in the United States] and [has] not been admitted." *Id.*  In contrast, it construed "seeking admission" as referring to a noncitizen's requests for "inspection and authorization" if he is not yet physically present in the United States but wishes to enter. *Id.* According to the Second Circuit, a noncitizen who is present in the United States may be an applicant for admission but is not automatically seeking admission.  *See id.*  It held that "because Section 1225(b)(2)(A) applies only to a noncitizen who is both an 'applicant for admission' and 'seeking admission,'" it does not apply to petitioners in this Circuit who are already inside the United States.  *Id.* (citation omitted).

Respondents contend that the Court should separate its consideration of Petitioners as falling into two categories: those that were released into the United States on parole pursuant to 8 U.S.C. § 1182(d)(5)(A) and those that were not.

Respondents concede that the Court will likely conclude that Petitioners' Donado and Amin detention is governed by § 1226(a) because they were released under their own recognizance. *See Gonzalez*, No. 9:26-CV-1435, Dkt. No. 7 at 5.  Respondents do not agree with that conclusion, but "recognize that the Second Circuit's decision in *Barbosa da Cunha v. Freden*, 175 F.4th 61 (2d Cir. 2026), and recent decisions applying that authority, likely controls[.]" *Id.*

However, they argue that *Barbosa da Cunha* "does not govern cases in which a noncitizen was apprehended at or near the time of entry, processed under § 1225(b), and subsequently

13

released on parole under 8 U.S.C. § 1182(d)(5)(A)." *Ebrahimi*, No. 9:26-CV-1436, Dkt. No. 7 at 3-4. They assert that "[u]nlike statutory parole under § 1182(d)(5)(A), an [Order of Release on Recognizance] contains no statutory command returning the noncitizen to the custody from which he was released." *Gonzalez*, No. 9:26-CV-1435, Dkt. No. 7 at 9. Respondents aver that the "express return-to-custody mechanism materially distinguishes statutory parole from release on an" Order of Release on Recognizance because those who were released on parole pursuant to § 1182(d)(5)(A) "remained applicants for admission who were temporarily permitted physical presence in the United States pursuant to § 1182(d)(5)(A), which expressly provides that parole is not an admission and contemplates return to the custody from which the noncitizen was paroled." *Id.* at 11.

This Court recently addressed whether *Barbosa da Cunnha* applies to individuals who were released on humanitarian parole under § 1182(d)(5)(A) in *Hernandez Villasmil v. Blanche*, No. 9:26-CV-713, 2026 WL 1235068, *3 (N.D.N.Y. May 5, 2026). In *Villasmil*, the undersigned first acknowledged that 8 U.S.C. § 1182(d)(5)(A) states as follows:

> [W]hen the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

*Id.* (quoting 8 U.S.C. § 1182(d)(5)(A)). The Court then agreed with other judges from this District and courts across the country that "that the mandate in 8 U.S.C. § 1182(d)(5)(A), . . . requires the petitioner to 'be treated just as the INA would treat any noncitizen previously granted parole and living in the United States.'" *Id.* (quoting *Pereira v. Dedos*, No. 1:26-CV-1141, 2026 WL 1134030, *2 (D.N.M. Apr. 27, 2026)) (collecting cases). In other words, "§ 1182(d)(5)(A)'s

14

mandate that a [noncitizen] return to 'the custody from which he was paroled simply means that the [noncitizen] must return to the 'care and control' of the Department of Homeland Security.' It says nothing about the 'status' the [noncitizen] will hold or the detention authority under which the government will operate once the parolee returns to such care and control." *Id.* (citation omitted).

This Court "agree[d] with the collection of district courts from across the country, and applie[d] the Second Circuits guidance" to conclude that the "[p]etitioner, who was released into the United States on his own recognizance under humanitarian parole in 2023 and continued to reside in the United States for one year after his parole had been terminated" could not "be said to be 'seeking admission.'" *Id.* at *6. Therefore, § 1225(b)(2)(A) did not apply. *Id.*

The same conclusion applies to the five Petitioners that Respondents assert were not released on their own recognizance. Each Petitioner had been released into the United States by DHS on some form of parole and Respondents present no reason to detain them other than the purported expiration or termination of that parole.

The statute Respondents rely upon in their papers, states that "parole shall be terminated *upon written notice* to the alien . . . ." 8 C.F.R. § 212.5(e)(2)(i) (emphasis added); *see Ebrahimi*, No. 9:26-CV-1436, Dkt. No. 7 at 2, 4; *Gonzalez*, No. 9:26-CV-1435, Dkt. No. 7 at 11. Petitioners were not terminated from parole until <u>after</u> they were already arrested by ICE. The letters that Respondents have provided to the Court indicate that parole was terminated as of the date of the letter, August 4, 2026, despite Petitioners having been arrested on July 26, 2026. Respondents state that "ICE [] treated their detention on July 26, 2026, as a return to custody following the termination of parole rather than as the revocation of a prior release determination under § 1226(a)." *Ebrahimi*, No. 9:26-CV-1436, Dkt. No. 7 at 5. Additionally, "Respondents [] maintain that termination of parole restored Wakil and Qasimi to the §1225(b)(2)(A) detention framework

15

from which they had been temporarily released." *Gonzalez*, No. 9:26-CV-1435, Dkt. No. 7 at 12. However, Respondents' assertions are baseless when juxtaposed with the letters they submit from ICE which state that Petitioners' Ramirez, Wakil, and Qasimi, parole was terminated on August 4, 2026. *See Gonzalez*, 9:26-CV-1435, Dkt. Nos. 7-14, ; *Ebrahimi*, No. 9:26-CV-1436, Dkt. No. 7-19. Respondents provide no legal authority which shows that a parole termination letter that is served two weeks after an arrest meets the notice requirements of 8 C.F.R. § 212.5(e)(2)(i).

As to Petitioner Gonzalez, he never received a termination letter. Rather, he received an NTA on April 1, 2026, instructing him to appear in Buffalo, New York, on December 31, 2026. *See Gonzalez*, 9:26-CV-1435, Dkt. Nos. 7-25 at 1. Insofar as Gonzalez's parole ended one year after it began on May 23, 2022, *see id.*, Dkt. No. 7-23, he remained in the United States for approximately three years before being lured to the Albany ICE ERO office on July 26, 2026.

Courts across the country have held that "where a petitioner's re-arrest was *not* a continuation of the initial border encounter, but an independent decision to detain the individual after the expiration of his parole, the detention pursuant to that re-arrest arises under § 1226." *Ivonin v. Rhoney*, No. 6:25-CV-6673, 2026 WL 199283, *4 (W.D.N.Y. Jan. 26, 2026) (citing *Campbell v. Almodovar*, No. 1:25-CV-9509, 2025 WL 3538351, *6 (S.D.N.Y. Dec. 10, 2025)); *see also Torrez Arce v. Blanche*, No. 9:26-CV-501, 2026 WL 1430509, *1-4 (N.D.N.Y. May 21, 2026); *Ab-Rahim v. Marich*, No. 6:26-CV-6005, 2026 WL 279113, *1 (W.D.N.Y. Feb. 3, 2026); *Simms v. Arteta*, No. 26-CV-5712, 2026 WL 2076009, *3 (S.D.N.Y. July 17, 2026); *Escalona v. Warden*, No. 26-CV-3920, 2026 WL 2018505, *3 (E.D.N.Y. July 13, 2026); *Silva v. Warden, Lincoln Cnty. Det. Ctr.*, No. 8:26-CV-131, 2026 WL 926725, *1 (D. Neb. Apr. 6, 2026); *Kharti v. Gantt*, No. 26-CV-1637, 2026 WL 2296495, *1 (W.D. Okla. Aug. 10, 2026); *Issaou v. Lows*, No.

16

3:26-CV-2031, 2026 WL 2280677, *6 (M.D. Pa. Aug. 7, 2026); *Perez v. Blanche*, No. 4:26-CV-5935, 2026 WL 2283649, *2 (S.D. Tex. Aug. 7, 2026).

Respondents have not presented any authority which persuades the Court to disagree with its prior decisions, the Second Circuit's decision in *Barbosa da Cunha*, or the horde of district courts from across the country which have disagreed with Respondents' arguments. Accordingly, under the facts presented in these cases, § 1226 applies to Petitioners' detention.

**C.      Merits of the Petitions**

To evaluate whether a petitioner's detention violates due process, courts analyze the following factors:

> (1) "the private interest that will be affected by the official action";
> (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

*Hernandez Villasmil*, 2026 WL 1235068, at *8 (quoting *Black v. Decker*, 103 F.4th 133, 151 (2d Cir. 2024)); *see also Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

Petitioners' private interests are "'the most significant liberty interest there is—the interest in being free from imprisonment.'" *Rashid v. Trump*, 807 F. Supp. 3d 349, 367 (D. Vt. 2025) (quoting *Velasco Lopez*, 978 F.3d at 851); *see also Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004). Petitioners have been detained for two weeks. There is no indication that any Petitioner received a pre-detention hearing or any kind of individualized custody determination before their arrest. This Court recently recognized that "'§ 1226(a)'s implementing regulations require an individualized determination as to whether the detention of a noncitizen is appropriate after considering whether the noncitizen (1) is a "danger to property or persons" and (2) is "likely to

17

appear for any future proceeding."'" *Parra v. Ball*, No. 9:26-CV-1162, 2026 WL 1960934, *4 (N.D.N.Y. June 30, 2026) (quoting *Hyppolite v. Noem*, 808 F. Supp. 3d 474, 491 (E.D.N.Y. 2025)). Respondents "have not demonstrated, or even suggested, that any individualized determination was made as to whether Petitioner[s] posed any risk of flight or danger before he was detained." *Id.* The record shows only that ICE arrested Petitioners after each of them reported to the ERO suboffice in Albany, New York as "demand[ed]" by the Alternative to Detention program. Dkt. No. 7-1 at 2. The irony of Petitioners' detention being a result of their compliance with the Alternatives to Detention program is obvious.

"'ICE must obtain a warrant before arresting a noncitizen unless the officer "has reason to believe that the [noncitizen] is in the United States in violation of any such law or regulation *and* is likely to escape before a warrant can be obtained for his arrest."'" *Rea v. Ball*, No. 9:26-CV-1248, 2026 WL 1959270, *2 (N.D.N.Y. July 2, 2026) (quoting *Curimilma Quille v. Blanche*, No. 26-CV-2818, 2026 WL 1453889, *5 (E.D.N.Y. May 22, 2026)); *see also* 8 C.F.R. § 287.8(c)(2)(ii).

Here, DHS's paperwork indicates that Petitioners were arrested on July 26, 2026. The warrants for each of their arrests are dated and were served the next day, July 27, 2026. Worse still than a one-day delay, is Petitioner Amin's situation. He was arrested on July 26, 2026, and he was not served with a warrant until August 8, 2026. Respondents ignore this, entirely. "[I]t is uncontroversial that the Fourth Amendment applies to aliens and citizens alike." *Cotzojay v. Holder*, 725 F.3d 172, 181 (2d Cir. 2013). "[A]fter-the-fact arrest warrants can be called many things—illegal, improper, and unconstitutional, among them. But whatever label one wishes to apply, the practice is fundamentally at odds with . . . constitutional behavior in this country." *Parada Cruz v. Mullin*, No. 26-CV-1110, 2026 WL 1027441, *5 (E.D.N.Y. Apr. 16, 2026).

18

Section 1226(a) expressly states that "an alien" may be arrested "on a warrant issued by the Attorney General . . . ." 8 U.S.C. § 1226(a). Here, no Petitioner appears to have been arrested on a warrant because the warrants were created and served after the arrests.

Respondents argue they had authority to arrest Petitioners under § 1225(b)(2)(A), which does not carry the same warrant requirement. *See* 8 U.S.C. § 1225(b)(2)(A) ("[I]n the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title"). However, Respondents see the writing on the wall. They recognize the Second Circuit's decision in *Barbosa da Cunha* and acknowledge how it has been applied in cases such as these, but warrantless arrests of law-abiding individuals who have been known to DHS for years, continue.

Petitioners have no criminal history. None of them were actively committing a crime. Many had legal authorization to work in the United States. Some have United States citizen children. In their papers, Respondents choose to turn a blind eye to the fact that many of the Petitioners were legally authorized by DHS to work in this country. Petitioners reported to the ICE suboffice as they were told. Yet, because Petitioners were not born in the United States and they followed the instructions they were given by ICE, they were arrested without a warrant and transported from the Capital Region to Buffalo.

Respondents have not provided any justification for engaging in such conduct except for the purported § 1225 authority—an argument which this Court and the Second Circuit have already dispensed. Under the circumstances presented, Petitioners' interest in remaining free weighs heavily on the Court's decision to order immediate release.

19

Regarding the Government's interests, "courts have recognized that 'detention in the immigration context "has two regulatory goals: ensuring the appearance of [noncitizens] at future immigration proceedings and preventing danger to the community."'" *Martins*, No. 9:26-CV-95 (N.D.N.Y. Feb. 3, 2026), Dkt. No. 16, at 14 (quoting *Rashid*, 807 F. Supp. 3d at 369; citing *Velasco Lopez*, 978 F.3d at 854).  Respondents have not shown how Petitioners' detention furthers these goals.  They have not argued that any one of the seven Petitioners involved in the two cases pose a flight risk.  The record lacks any indication that Petitioners have thwarted immigration courts or their ATD supervision.  Likewise, the Government has not argued or provided any evidence that Petitioners have a criminal history or pose a risk to the community or national security.

Based on the foregoing, Petitioners' detention is unjustified under § 1226's discretionary framework and violative of Petitioners' constitutional rights.  *See Hernandez Villasmil*, 2026 WL 1235068, at *9; *Torrez Arce*, 2026 WL 1430509, at *4-6.  Because Respondents have not offered any reason for Petitioners' detention, the Court orders Petitioner's immediate release from custody.  *See Hernandez Villasmil*, 2026 WL 1235068, at *9 ("As the Government has not presented a single reason why Petitioner should be detained—they have not argued nor presented any evidence that he is a danger to the community or a flight risk—and Petitioner has remained free in this country, working, law abiding, and waiting for his June 2027 immigration court hearing, immediate release is the appropriate remedy"); *Rea*, 2026 WL 1959270, at *4 (ordering immediate release where the petitioner was arrested without a warrant and the *Mathews* factors weighed against keeping the petitioner detained).

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the

applicable law, the Court hereby

**ORDERS** that the petitions for writs of habeas corpus (Case No. 9:26-CV-1435, Dkt. No. 1 and Case No. 9:26-CV-1436) are **GRANTED**; and the Court further

**ORDERS** that this decision shall be filed in both of the above-captioned cases; and the Court further

**ORDERS** that Petitioners shall be released from custody no later than Wednesday, August 12, 2026, at 5:00 P.M.; and the Court further

**ORDERS** that Respondents certify compliance with the Court's order regarding Petitioner's release no later than Thursday, August 13, 2026, at 9:00 A.M.; and the Court further

**ORDERS** that, having considered the particular circumstances of this case and *Mathews v. Eldridge*, 424 U.S. 319 (1976), Petitioners shall not be re-detained without adequate notice to Petitioners and without an opportunity to be heard at a hearing where the Government will have the burden of showing that his detention is authorized under 8 U.S.C. § 1226(a) and the burden to demonstrate by clear and convincing evidence that Petitioners is either a danger to the community or a flight risk; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Petitioners' favor and close these cases; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated:  August 12, 2026
        Albany, New York

Mae A. D'Agostino
U.S. District Judge

21